3230424 the people of the state of Illinois Appalee versus Sandeep S. Aurora Appellant. Ms. Fleming, you may proceed. Good afternoon, your honor. I'm Appalee in this case. Oh, I'm sorry. We got this picture switched. No problem. I might have messed up my name. Oh, that's all right. Mr. Brayman, then you may proceed. You're the appellant. Thank you very much, Justice Holdredge. And may it please the court, counsel, Ms. Fleming. My name is John Brayman, and I represent the defendant appellant in this case, Sandeep Aurora. And we are the appealing party. So we do go first. And I want to, at the outset, thank the court for its time, but also acknowledge that certainly, in terms of the posture of the case, it is one of the more challenging postures that you have on an appeal. This was a bench trial that proceeded in DuPage County, where our client, Mr. Aurora, testified. There were credibility findings that were adverse to him that were made by the trial court and judges, justices. I know the court is well familiar with the factual record as is Ms. Fleming. And I want to highlight some of the aspects of what I think provides our claims of both trial court error and sentencing error in terms of some of the unique aspects of the case, even acknowledging the posture that we find ourselves in here. In terms of the case itself, the court is familiar with the case. We're not seeking to retry the case here or rehash all of the details. Mr. Aurora testified in the case. He has always maintained his innocence and has always maintained that this was a consensual encounter with SC. The factual to the bars in Naperville that she and a friend got into a taxi cab that was driven by Mr. Aurora. And despite it just being her and her friend, she got into the front seat of the taxi cab. She remained in the front seat of the taxi cab after Mr. Aurora dropped off the friend, Mr. Shireman, at his home. And both SC and Mr. Aurora testified to their version of what happened objectively, even with taking SC's testimony at its face value. She indicated that there was no threats of force, that there was no objective manifestations of her non-consent to the flirtation, to the sexual encounter that proceeded, and that Mr. Aurora never restrained her or threatened her in any way. The case was tried after SC had filed a civil lawsuit against Mr. Aurora. So the parties did have the benefit of the civil sworn deposition transcript of SC. And in it, and this is within the briefs, and I don't want to go bullet point by bullet point because it's well in the record and in the briefs, is that there was inconsistencies were not only, that were not on minor points or minor discrepancies, but factual, you know, significant factual points, including the source of injuries or even the existence of injuries, how much that she had had to drink, which played into ultimately the findings that the trial court made, and also, you know, her level of intoxication. And then also, you know, this thing about how her underwear was damaged and what role her puppy had played into that. Also, you know, kind of the main ones, whether it hurt, according to her, when Mr. Aurora had purportedly grabbed her and whether he used any force to hold her down. And so those, those, those factual propositions were put before the court, both with direct testimony, but also through the cross examination of SC. And, and ultimately there was very much, there was very much a lot of, I do not recall in terms of the civil deposition transcript, but it was offered in evidence and it was in many important and significant respects inconsistent with her testimony at trial. In terms of the justices, in terms of the sufficiency, the case is well briefed on the elements of force or threat of force and also on bodily injury. Our position is that Mr. Aurora testified credibly. He was corroborated by other evidence and SC was, was impeached in significant ways on factual disputes. And then ultimately there were findings that were made in the court where the findings were based on an assertion by the state that was accepted and expounded upon by the trial court that in no universe would a young, a young woman, and it was a young Caucasian woman, and this came up in the context of the, the admission of proof of other crimes or 404B evidence because the court allowed another young Caucasian woman in her 20s, and this was, and this is in the record, this is not me just saying this, was that it's young Caucasian women getting into the cab of a stranger, Mr. Aurora, as a passenger, they didn't know him, and it was the court's finding, and it was, it was put forward by the state that in no universe, in no universe would this young woman from Naperville be physically attracted or sexually attracted to Mr. Aurora. It's not supported in the record, and, and so I think that that was at base a speculative belief on the court's part, and ultimately, I mean, there are, there's actually pictures of Mr. Aurora in the record. I don't, there's nothing objectively repulsive about him. He's a good, good looking man, but, but the, the factual proposition was in no universe would these two people who, who didn't know each other just engage in some type of flirtation in a sexual encounter. Ultimately, the finding, though, by the judge in terms of explaining away the, the lack of objective expressions or objective manifestations of S.C.'s lack of consent was that the court ultimately found that that was because she was under the influence of alcohol. That despite her testimony that she had her faculties about her, the judge found that he found that she likely was intoxicated, and that was, and she didn't testify to this, this was, this was speculation on the court's part in his findings, but that that was likely because she's under the influence, and so she's not going to say no or, or, or push away or try to, try to leave the cab or have any, any objective manifestations that this was, that this flirtation, this advance was anything but consensual. And so, you know, when, when we talk about consent and that's raised, it needs to be disproved by the state beyond a reasonable doubt, and, and our position is that it was not, and that ultimately the court's finding that, that there were these, that there was a lack of objective manifestations of non-consent, that those were based on her, her likely intoxication, which is not what she testified to. She said she had the faculties about her, and when we're dealing with an adult person who has their faculties about them, the, the, the have, having to give objective manifestations to the other person that any type of advance or flirtation is unwanted becomes something that has to happen. I say this in the context of, there's a case in the, in the record that, that talks about there's, there's Denbo and there's the, the Vasquez case, I believe in the Vasquez case actually dealt with a minor who, who was held to a lower standard, that in terms of the, the, the proposition that some type of, some type of resistance, either verbal or physical, or an attempt to, to leave the situation, that that would be met with utility and that, that would not be, that would not be successful, was inconsistent with the facts of this case as to what SC testified, and ultimately in, in the Vasquez case, and, and all the cases stand for the proposition that the force element, the force that has to be proved, the use of force has to be something that is not inherent in the sexual act itself, but something independent and separate, and that also, that in terms of, even in the context of a juvenile, that, that, that, that juvenile who's held to a lesser standard in terms of having to give some indication of an objective manifestation that this is not a consensual encounter, that, that, you know, even in that context, that, that juvenile did not do that, and in this case, everybody, everybody fairly agreed that there was no verbal or physical resistance. There was not any attempt to, to leave the cab, even though SC testified that the cab was traveling at a slow rate of speed, that it was going, that it hit some curbs, which was inconsistent with some of the evidence that was presented by way of the vehicle itself, and of course, it was inconsistent with, our client's testimony. Ultimately, there were credibility findings that were made, but I, I highlight those things because I think they're unique, and I think that the interplay with the facts of our case in the case law presents an interesting fact pattern for the application of law for this court. On the other points that we raised, we have a claim that the 404B evidence, that it was erroneously admitted into evidence, and that it was used ultimately to show lois operandi, and I won't belabor that point too much. It's well briefed, but ultimately, a second, a second complaining witness testified, who, who testified, and ultimately, the state had the proposition that she was unsatisfied with the prosecution, misdemeanor prosecution that happened against Mr. Arora, that was investigated and ultimately was prosecuted as, as a misdemeanor. You know, it was investigated, and it was put into the system as misdemeanor, stipulated bench trial, and he was given supervision. Ultimately, that, that, that woman, JW, was not cross-examined. There's no claim of error on that, but ultimately, the, the admission of that testimony, it was, it was erroneous. It was used for improper purposes when it came to ultimately arguing that this was, both of these women were Mr. Arora's type, that this was a pattern, his MO, and his propensity, and ultimately, the, the admission was erroneous, but it also, it, it also played into the ultimate findings of fact, and, and the, the argument from the state that there was a, there was a success, a second purported victim out there that was unsatisfied, and didn't feel like she had been given justice on the first prosecution, and I think ultimately, it played into the trial court's determination on, on guilt versus acquittal, and it also played into the court's determination when it came to sentence, and so I'll move to the sentencing issues. There's two of them. Ultimately, Mr. Arora was, his, his testimony was completely discounted in terms of its veracity. It was corroborated by other testimony, and then we did have just the baseline of what I've laid out to the court, and in the briefs of this, according to anybody's version, that there was no objective manifestations of non-consent, and that's important because ultimately, all of, all of these crimes that are charged in the indictment, and that were sustained in terms of findings of guilt, all of the elements, they all, they all require that he knowingly engage in criminal sexual assault, and, you know, the objective manifestations of non-consent are important because that, that is how somebody knows the difference between something that is wanted consensual behavior, or something that is not wanted and rejected by the other person. In terms of the sentencing, sentencing issues, he is convicted across the board of everything. He is, the minimum, the mandatory minimum on the case that's in place is over a decade in the penitentiary for a man who has never served a penitentiary sentence or a jail sentence in his life. He's supported in court here, and I know his family will be listening to this argument later, he was supported in court by a loving spouse, his wife Shilpa, his sisters, his two sisters, he's got, he's got young children at home. He, there was, there was lots of mitigation, lots of mitigation that was put in front of the court in terms of his caretaking to his mother, that his young children were going through, not only separation from their father after the, the guilting finding and the remand of custody, but actually, you know, physical trauma as a result of, of course, that was on the case, bullying in school, anxiety, and all of those things, while, you know, he, he, the court did allow JW to testify, it was prior, you know, it was a prior prosecution that really played into ultimately the sentence, which was 25 years, and it's, it's not 12 and a half years where he can, he serves day for day and does half of it and can get into programs and try to, you know, get the benefit. Your time has expired. Oh, I apologize. No, no, it just, it just came up, but you will have time in reply. Sure, Judge, and just so it's clear, we also have one other claim that has to do with, with sentencing credit, and I just want to put that out there. I know that my time's expired, so that's not first time brought up. Thank you. Maybe questions from the bench. Are there any other questions? Are there questions from the bench? Justices? No, there aren't. You'll have time in reply though, Mr. Raymond. Okay. Thank you very much, Justice. Counsel Fleming, you may respond. Now it's my turn. Good afternoon, Your Honors. Counsel, may it please the court, Mary Fleming, Assistant State's Attorney on behalf of the people, and I'll be up front that I have come back from winter break with several illnesses, so if you have trouble hearing me at some point, just signal. I've got my microphone all the way up, so today is probably better. Okay, good. All right. In this case, the issues mostly relate to the conduct of the trial judge, who we all know is presumed to know and follow the law, and in this case, the evidence shows that he did so. He weighed the credibility of these witnesses, and the testimony of the victim is enough here, even when it's contradicted by the defendant. It's corroborated by her immediate outcry, her behavior afterwards. It's corroborated by another victim who's a stranger to her and a stranger to the defendant. Defendant's story would expect us to believe that these two strangers independently came up with almost identical stories of getting into a cab with a stranger and submitting to rough sex. It makes sense that the judge didn't buy this story, and this court should not accept the defendant's invitation to retry him and the credibility determinations that were made here. Obviously, the other crimes evidence we felt was very important here, and it was not M.O. in this case, to be clear again, because everyone knew the identity of the defendant. And when we start to talk about whether the victim would have been attracted to him, we're kind of veering into rape shield issues, which we want to stay away from. These two didn't have any history. There was no reason to get into that, but regardless, the record showed that this was not consensual. This woman got into the cab to do everything right, and she paid for it with the defendant's behavior. This is clearly not conduct she consented to, and the judge's sentence took that into consideration. He clearly considered the mitigation. He considered the defendant's family. He considered the defendant's history, and he fashioned a proper sentence that was not even towards the higher end range of what was possible in this case. And while I did not pull the records for defendant while he's in D.O.C., it's important to note that if this case was remanded, he could be possibly facing more prison time than he was. And he was given the proper amount of credit. We would ask that this case not be remanded. The judge already gave the defendant credit for time that he was at home, but subject to electronic monitoring. What the judge felt was veering closer to a detention. And if we accept the defendant's argument that he gets all of the time, then everyone on bond gets all of the time that they're on bond. And that's just simply not what the statute says. So we would ask this court to uphold your opinion. What does this statute say? Excuse me, your honor. I'm sorry. I think you cut out a little bit. What does this statute say in your opinion? If defendant was subject to some sort of home detention, he would get that credit. And the case law that talks about what that means looks at some sort of restriction that is more than what we have in this case. We have cases where someone was reporting to sort of a day camp with a sheriff. That would count. You need more of a restriction, the courts say, of where you can move, who you can see, your time. When you're at home, you're not expected to show up by a certain time or do certain activities at a certain time. He was at home both with an electronic monitor and then at home without one. Correct. So distinguish that for me. Well, in this case, the court talked about the GPS monitoring for a risk of flight, not necessarily to keep him where he was. But regardless, he got credit for that time that he wore the monitor. Yeah, only for the monitor. Why not? What is operative about that monitor under the statute as it exists now? The statute says the monitor isn't important. That's not the key. But the judge felt like that was important in this case. And so he went ahead and gave credit for that time. I think maybe more than I would have given if I was the judge, but I'm not the judge. So the issue is, what is the distinction? And there was an error for the judge to make that distinction. Was it an error? Is that what you're asking? Do I feel like that? I'd like you to address it, please. Okay. I feel like that wasn't the distinction and it should not have been. And the statute says that it should not be. And our position was that he should not get credit just because the difference was the monitor. Well, obviously your position is shouldn't be given credit at all, right? My position is he should be given whatever proper credit he deserves. Absolutely. But it doesn't appear that that meets the definition under the statute of time that he should be given credit for. Okay. What is that definition that supports your position? Your Honor, it talks about, we cited to the Donahue case, which talks about that distinction between detention and supervision. And the courts have, when they've looked at it, looked at the definition of home detention, they've looked at the definition of custody. But custody alone isn't enough. And so we've got some language, custody as contemplated by the statute did not encompass any time that an offender was released on bond, regardless of the restrictions that might be imposed on him during that time. And what the courts say is we're looking at something, some regimentation of life, like you get in jail or in prison is what the Supreme Court has said. And when you're within your home, you're able to enjoy more unrestricted freedom of activity, movement, and association. So your position is he should have gotten credit regardless of having a bracelet or not? Correct, Your Honor. We're not raising that issue at this point. We're not trying to take away that credit, but that is correct. Yeah, but we have to look at it, because it's part of the sentencing problems that have been raised. Correct, Your Honor. Okay. Please continue. Well, with that, I was about to wrap up. But if you have any other further questions on that, I'm happy to discuss. Okay. Are you wrapping up then? You're concluding? I am, Your Honor. We would ask this court to withhold, to uphold the conviction and sentence. Thank you. Thank you. Any questions from the bench? Further questions? No. Okay. Mr. Brenneman, you may respond. Thank you, Justice. Let me pick up where Ms. Fleming left off. So in terms of the Donahue case, and this was addressed in the trial court, actually. I mean, there's a claim in the response brief that we responded to in our reply about the being forfeited. The issue was raised at the trial court before the sentencing, at the sentencing, after the sentencing, in this court. So certainly no issue of forfeiture. And, you know, the Enoch case, which we see all the time in the context of trial error, if that had been raised at any point before a conviction, I think everybody would look askance at the lawyer standing before them talking about the home detention statute. But what did happen, and this is, of course, all in the record and was put into the record in front of the trial court and was argued, was that, I mean, the Donahue case dealt with a person that was sentenced before the change in the law. The baseline that we have is the statute itself. So we're not dealing with people from prison that are appealing based on, you know, a change in the law and saying, well, I should get the benefit of the change in the law retroactively. What we do have is a change in the law. And the court made very clear that he, that the court disagreed with what the law that had been passed in Springfield. He was somewhat candid in his recitation and talked about the idiotic legislatures who had passed the law. And, but what's important is, of course, it's the law. So it is, it's the context, though, that underlies when the court talks about its understanding of the law, because it was, it's a relatively new law and trial courts and lawyers in lower courts are dealing with the changes in the law and what the 10-page detention statute means and what the changes in the law actually mean in this day and age when it is the law. But the trial court said, and this is founded in the impounded record at 1098 and 99, and it's within both the opening and the reply brief. It's a footnote on page four of our reply brief. And this is a quote. So you can actually be on electronic home monitoring without a monitor and you get credit for it. That's how far there are, I'll say it, are idiotic legislatures say is that you can get credit for it. I don't agree with it, but that's what they told me to do. Okay. So, so let's, yeah, all well and good. What does the law say in black and white? And the other part of that footnote on page four, Justice Holdrege, is comparing it to the law, which is found in the Illinois compiled statutes at 1130 ILCS 5 backslash 5 dash 4.5 slash 100 subsection B. And it's, and I'm quoting from it, the trial court shall give credit to the defendant for time spent in detention, which includes, and this is to start the quote again, includes restrictions on liberty, such as curfews and electronic monitoring, but quote, but quote, electronic monitoring is not required for home detention to be considered custodial for purposes of sentencing credit. And so the baseline that the trial court was working from that his understanding of the law was that electronic home monitoring that you can get credit for electronic home monitoring without a monitor. It's not consistent with the plain language of the statute. It's not consistent with the law as it, as it exists now. And that's, it's a shall, it's a mandatory situation. And with the procedural history here, when Mr. Aurora originally went to court, he was on all kinds of restrictions. He was on electronic monitoring, GPS, and all these different things that he had to stay in his home, except for work and school. And the only thing that came off when it was modified in January, some weeks after the initial setting was the GPS requirement. And so there were all kinds of restrictions on his liberty and the finding denying the some 1500 days plus of credit. It's not an academic point. It makes a real difference to Mr. Aurora, given the context of what we say is an excessive disproportionate and unreasonable sentence. And based on that, judge, we would justices, we would ask this court to closely examine the record, which I know you'll do as to each of the elements that was put before the court, because we're asking for outright reversal, but in the alternative, we're asking the court to exercise its powers here to reduce the offenses and ultimately give the credit that he was due and also reduce if the court finds that the convictions are going to stand in part or in whole to give him the credit that he, that is mandatory under the law as it now exists. Thank you very much. Questions from the court? Just one, Mr. Brehm, you said all kinds of restrictions. It was my understanding. It was simply that he could only leave his home to go to work, go to school. Otherwise he had to be at home. What were the other restrictions that you were talking about after the hearing on December 14th and the bracelet came up? So they were the subject and it's, the order is in the record, but it was home detention, but for school and employment. And then there was the restriction of electronic monitoring and the GPS component itself. No, after that was taken off. Yeah. So, so it was, it was home detention, but except for school and for, for for school and gainful employment. And so it's, it's home detention. So it's certainly a restriction, but the only condition that came off and, and this is, this is within the record and the briefs, the only restriction that came off was, was the monitor itself, which the trial court thought was, was what was required, that it was required, but it wasn't under the statute. So there was, there was this, this confusion that I think the court and, and justice Holdridge spoke to a bit around what is required and what isn't. And the only restriction that came off was the monitor, which wasn't required. It was home. It was a home detention order. And then there was a modification, but it wasn't like it's not as Ms. Fleming has suggested. He wasn't just on a straight bond, no restrictions at all. He was on a home detention order. And the only thing that was modified was the requirement of the monitor itself. Thank you. Other questions? No, thank you. Okay. Well, thank you counsel, both for your arguments in this matter this afternoon, it will be taken under advisement, a written disposition shall issue.